Gkeen, J.
delivered the opinion of the court.
Í This is an issue of devisavit vel non, to determine whether the paper propounded, is the last will and testament of Richard Long. The jury found in favor of the wil|V'.and the defendants appealed to this court.
On the trial, in the circuit court, the plaintiff offered in evidence, the record of a proceeding in the chancery court at Lewisburg, in the nature of an inquisition of lunacy. This proceeding was a bill filed by Thomas Long, Gabriel Long and James Shaw, against Richard Long, alleging that, Hsaid Richard Long was incapable of attending to his business, in consequence of infirmity from age,” and praying that an inquisition issue, &c. A writ was issued to enquire “whether Richard Long was of sound mind, sufficient to attend to his own business.” The jury returned, “that Richard Long was of *255 sound mind, and capable of taking care of himself, and managing his affairs.”
The defendants objected to the reading said record as evidence, but the court over-ruled 'the objection, and it was permitted to be read; the court instructing the jury that, it was not conclusive, but prima facie evidence of the facts found therein by the jury.
It is no'jv insisted for the plaintiff in error, that his Honor, the circuit judge, erred, in permitting the said record.to be read, and in his instruction to the jury, because the chancery court, in this* State, has no jurisdiction of idiots and lunatics: and so we think.
Our act of 1797, ch. 41, gives to the county courts jurisdiction, to ascertain by inquisition, the idiocy or lunacy of any idiot or lunatic, who may reside in their county, and upon the return of such inquisition, to appoint guardians, &c. No legislative enactment confers upon the chancery court, either directly, or by implication, jurisdiction upon this subject. It does not, therefore, exist, unless it appertains to the chancery court, as a branch of its equity jurisdiction. But all the. authorities are explicit, that this is not the case. In England, the chancellor, it is true, exercises this jurisdiction; but it is a personal trust delegated to him under the sign manual of the King, and not as a court of equity. In Shelford on Lunacy, p. 15, it is said, “ when a person is found an idiot or lunatic, the King alone has the power to grant the custody of the idiot or lunatic, and his estate by sign manual, and therefore to save repeated applications to the crown, it has been the practice of the crown to entrust such power, by warrant, under the sign manual, countersigned by the two secretaries of State, to the Lord Chancellor, on his coming into office; by virtue of which warrant, and *256 not as chancellor, he has the ordering, and disposition of the persons, and estates of idiots and lunatics; and such warrant confers no jurisdiction, but only a power of administration.” Again, p. 18, he says: “neither the master of the rolls, nor the vice chancellor can sit for the Lord Chancellor, or make any orders in matters of lunacy.”
In Story’s Equity Jurisprudence, sec. 1335, the distinction is taken between the jurisdiction of the court of chancery, in reference to infants,- and to idiots and lunatics. He says: “the jurisdiction over idiots and lunatics is distinguishable from that over infants, in several respects. The former is a personal trust in the Lord Chancellor, and especially delegated to him under the sign manual of the King; and from his decree no appeal lies except to the King in council. On the other hand, the latter belongs to the court of chancery, and it may be exercised as well by the master of the rolls, as by the Lord Chancellor; and therefore an appeal does lie from the decision of the court of chancery, in cases of infants, to the house of Lords.”
It is manifest from the fact, that the jurisdiction as to infants may be exercised by the master of the rolls, and an appeal lies to the house of Lords, that this jurisdiction belongs to the court of chancery, and equally so, that the jurisdiction as to idiots and lunatics does not belong to that court, for the reason that neither the master of the rolls, nor the vice chancellor can make any order in relation to them; and an appeal lies only to the King in council. Sheldon vs. Fortescue Aland, 3 P. Will., 104, 107 Mr. Cox’s note (A); Sherwood vs. Senderson, 19 Vesey 285.
*257 ' All the authorities agree that, in the appointment of committees for idiots and lunatics, the chancellor acts as the mere delegate of the crown; but they differ as to the source of his jurisdiction in the orders and decrees which are subsequently made, touching the person and property of idiots and lunatics. It may be inferred from Lord Redsdale’s remarks, in ex parte Fitzgerald, (2 Sch. and Lef. 435,) that the superintendence of the conduct of the committee belongs to the court, as a court of equity. And so Mr. Shelford, (p. 17,) upon the authority of that case, states the law. But judge Story, (Eq. Jur., sec. 1364, note 2.) conclusively refutes the doctrine, by showing from the authorities, that no appeal lies from these orders and decrees, except to the King in council; whereas, if the chancellor acted in such cases as a court of equity, an appeal would lie from his orders and decrees, to the house of Lords. Certainly no appeal lies from the chancery court, acting as a court of equity, to the King in council, but to the house of Lords: and the fact, that an appeal from the orders and decrees, touching idiots and lunatics, lies, only to the King in council, is conclusive evidence that these orders and decrees are made by the chancellor, as the delegate of the crown, and not as chancellor. It follows from what has been said, that the entire jurisdiction of the chancellor, in England, upon the subject of idiots and lunatics, is derived from the warrant of the King, and that the chancery court, as a court of equity, has no jurisdiction of the subject.
In the application of these principles, how can it be said, that the court of chancery, in this State, has jurisdiction of this subject? We have no King, whose duty, and prerogative it is, as parens patria, to take care of *258 persons who have lost their intellects. Nor is there any department of our government which has the right to exercise the duties and powers which belong, in England, to the prerogatives of the crown, unless those duties and powers have been conferred by statute.
We cannot assent to the reasoning of the court of appeals of Kentucky, in the case Naylor vs. Naylor, 4 Dana’s Rep., 341. In that case, the court says: “ But though the powers exercised by the English chancellor were conferred on him, by the special warrant of the King, he exercised them as a judicial officer; and much of the business done by him, was judicial in its nature, and was as well for the benefit of the subject, as of the crown. And so far as the powers exercised by him were for the benefit, security and safety of that unfortunate class of individuals, as subjects of England, they were equally necessary for the protection, security and safety of the same class of individuals as citizens of the colonies, and as citizens of the commonwealth; and the laws in force there, are applicable here as to the rights of individuals, and remedy should be afforded by some tribunal.”
With deference, this reasoning seems to us, exceedingly loose, and deficient in discrimination. Because the chancellor exercised these powers as a judicial officer, although he had only a power of administration, as the King’s delegate, this jurisdiction, thus exercised, is to be assumed by our chancellors as part of their equity jurisdiction. Surely no such consequence results from the premises. But, it is next assumed, that as it was a good law in England, it is a good law here; and remedy ought to be afforded by “some tribunal.” Therefore, though in England, the power is exercised by the *259 chancellor, as the ministerial agent of the King, it ought to be usurped here, by our chancellors, sitting in courts of equity. Upon this reasoning, where will our chancellors stop, in the assumption of jurisdiction? What good law, the administration of which, elsewhere, has been salutary, may not cur chancellors assume the power to enforce ? Unquestionably, the jurisdiction of our chancery court cannot rest upon any such grounds. In the case under review, the jurisdiction was well exercised, because, in Kentucky, they have various statutes recognizing its existence, and directing the mode of its exercise. But in this State, we have no statute which, either expressly, or by implication, confers, or recognizes the existence of any such jurisdiction.
By the act of 1782, ch. 11, it is provided, that “each superior court of law in this State, shall also be and' act as a court of equity, for the same district, and possess all the powers and authorities within the same, that the court of chancery which was formerly held in this State, under the late government, used and exercised, and that are properly and rightfully incident to such a court, agreeable to the laws in force in this State, and not inconsistent with our present constitution.”
This act is the first which conferred equity jurisdiction upon the courts of North Carolina, after the revolution. It gives the courts of law “equity” jurisdiction, and they are to exercise the powers “ that are properly and rightfully incident to such a court.’’ This language clearly limits the jurisdiction, here conferred, to that which was exercised by the chancery court of England, as a court of equity. Nor does the fact, that this act confers such powers, as the “court of chancery formerly held in this State, used and exercised,” affect this conclusion. We *260 do not know wliat powers that court “used and exercised.” But, as in connexion with the powers so “used and exercised,” here conferred, there is a restriction that the powers conferred are to be those of a court of “equity,” and are only such as are “rightfully and properly incident to such a court.” We are necessarily left to infer that, the chancery court held in North Carolina, during the colonial government, did not “use and exercise” the jurisdiction in question. Indeed it would be absurd to assume that it did. The “court of chancery,” in England, does not exercise it but in virtue of his office as chancellor. When, therefore, our act of 1782, only confers “equity” jurisdiction, such as had been “used and exercised” by the “court of chancery” under the colonial government, and such as is “rightfully and properly incident to such a court,” we may safely affirm, that it does not confer the powers exercised by the chancellor of England, which the King confers by the sign manual; for such powers never were of “equity” jurisdiction; never were “used and exercised ” by the “ court of chancery;” and never could be said to be “ rightfully and properly incident to such a court.”
In the case of Green vs. Allen, 5 Hum. Rep. 170, this court (Judges Reese and Turley concurring) says: “It may be well assumed, that by a fair and legal construction of the act of 1782, no power but the extraordinary was conferred upon the court of chancery in North Carolina.” Certainly, since that act, none has been conferred; and, therefore, none other exists at this time.
We have seen, that the jurisdiction exercised upon this subject in Kentucky, is well warranted, because recognized by the statutes of the State.
*261 We are referred to cases where a like jurisdiction has been exercised in New York. It is certainly true that the chancery court of New York does exercise the same jurisdiction in relation to idiots and lunatics, that the chancellor of England under the sign manual of the King exercises. I have not had access to the statutes of that State, and am not able to trace, satisfactorily, the origin of this jurisdiction there. It has, however, been exercised from a very early period, and is regulated by statute. This will appear from the case of Brasher vs. Van Cortlandt, 2 Jh. Ch. Rep., 264, 402, where the chancellor refers to R. Laws, vol. 1, 147, for his assertion that, “the person and estate of the lunatics, and his maintenance, is expressly committed to the chancellor.”
These cases, from New York and Kentucky, furnish no argument in favor of this jurisdiction in Tennessee; because, as we have seen, the chancery court, in both States, derive their power from statutes. Here, no statute confers the jurisdiction; but, on the contrary, it is expressly conferred on the county courts, by the act of 1797, ch. 41.
2, But, it is alleged, that in the case before us, no inquisition of lunacy was awarded; but an inquiry, whether Richard Long was capable of managing his aífairs; and that such inquiry properly appertains to the court of chancery. It is supposed that this distinction is taken by Lord Eldon, in Ridgway vs. Darwin, 8 Vesey, 65; and by Lord Erskine, in ex parte Cranmer 12 Vesey, 445; and by chancellor Kent, in The matter of Barker, 2 Jh. Ch. Rep., 232: in which cases, the question is discussed, whether it comports with enlightened views of this subject, to adhere to the ancient strictness of con *262 fining the inquisition to cases of lunacy, strictly so called; and whether the entire deprivation of intellect no matter from what cause, is not equally within the jurisdiction of the court. On examination of those cases, it will be found, that neither of the chancellors intimates that the jurisdiction in such cases, is derivable from any other source, than that in regard to idiots and lunatics. The doctrine in these cases, is only a more liberal and beneficial application of the powers of the chancellor. Judge Story says, (Eq. Jur., sec. 1365,) “the commission is not confined to idiots and lunatics, strictly so called; but in modern times is extended to all persons, who, from age, infirmity, or orther misfortune, are incapable of managing their affairs, and, therefore, are deemed of unsound mind, or non compos mentis.” But the supposition that any return short of the finding, that the party is of unsound mind, will support the inquisition, is a mistake. In the case, eso parte Cranmer, Lord Erskine quashed the inquisition, and ordered a new inquiry, where the return was, that the party was so far debilitated in his mind as not to be equal to the general management of his affairs. He said, this return was too vague. What were his affairs? He said, that a person who, from grief, sickness, or old age, had lost his mind, belonged to the class of cases mentioned by Lord Coke, of persons non compos mentis; and that these were proper subjects of an inquisition.
These cases are only evidence of a more enlarged construction of their powers, by the chancellors; but the jurisdiction is not exercised by virtue of any other authority, than that which exists, in relation to idiots and lunatics, strictly so called.
*263 Although our statute uses the words “idiots and lunatics,” in conferring jurisdiction on the county courts, yet a proper construction of it may fairly embrace all persons of unsound mind, whether the mind be entirely and uniformly unsound, from disease, grief, or old age-, or whether there be lucid intervals, constituting lunacy in the strict sense.
We think it clear that, in neither case, has the chancery court in this State any jurisdiction of the matter; and that the proceeding in the case of Richard Long, was without authority, and that t-h'e return furnishes no evidence of the facts found; and, therefore, that his Honor erred in admitting the record of said proceeding in evidence, and in his charge to the jury.
Reverse the judgment, and remand the cause for another trial.